186 So. 354

## HARRISON et al. v. LOUISIANA HIGH-WAY COMMISSION et al.

No. 34886.

Jan. 10, 1939.

Rehearing Denied Feb. 6, 1939.

Wise, Randolph, Rendall & Freyer, Barksdale, Bullock, Warren, Clark & Van Hook, Wilkinson, Lewis, Wilkinson & Naff, Herold, Cousin & Herold, Dimick & Hamilton, Dickson & Denny, and Clifton F. Davis, all of Shreveport, for plaintiffs-appellants.

N. S. Hoffpauir, of Crowley, and J. Elton Huckabay, of Baton Rouge, for defendant-appellant Louisiana Highway Commission.

J. H. Jackson and Richard Switzer, both of Shreveport, for defendant-appellee City of Shreveport.

FOURNET, Justice.

Plaintiffs, who are owners of property abutting on the first block of Texas Street in the City of Shreveport, filed ten separate suits against the Louisiana Highway Commission and the City of Shreveport, each seeking to recover from the defendants damages in solido for injuries to their respective properties as a result of the construction by the Commission, with the approval of the City, of a bridge and

the approaches thereto, across Red River at the foot of Texas Street in Shreveport.

█ The suits were consolidated for trial over objection of defendants and, as consolidated, were dismissed as to the City of Shreveport on exceptions of no cause and no right of action. Plaintiffs appealed from that judgment. Similar exceptions were filed by the Louisiana Highway Commission but were abandoned, as they were not urged here or in the lower court. After answer the case was tried on the merits, resulting in judgments against the Commission and in favor of Mrs. Flora D. Harrison et al., in the sum of $7,400; J. C. Simon (substituted for Mrs. Esther G. Barron) et al., in the sum of $14,400; Dr. Paul D. Abramson, in the sum of $3,500; Mrs. Leona W. Bath et al., in the sum of $4,000; Mrs. Lucille K. Michel et al., in the sum of $4,750; Abe Meyer Corporation, in the sum of $2,750; Andrew Kuhn, in the sum of $7,400; Mrs. Lena J. Schnitt et al., in the sum of $4,000; Noel Estate, in the sum of $7,200; and Karam John et al., in the sum of $8,400; each with five per cent per annum interest from judicial demand. The Louisiana Highway Commission appealed from that judgment.

By agreement of counsel of all parties, the appeal by the Louisiana Highway Commission from the above judgments for damages and the appeal by the plaintiffs from the judgment dismissing their suits against the City of Shreveport were consolidated for the purpose of argument in this court.

This is a sequel to the case of Kuhn et al. v. Louisiana Highway Commission et al., 174 La. 990, 142 So. 149. In that case Kuhn and others, immediately after the recordation by the Louisiana Highway Commission of the contract for the construction of a bridge over Red River, filed suits, under the provisions of Article 1, Section 2, of the Constitution of 1921, against the defendants, seeking to enjoin them from constructing the bridge without having first been compensated for damages which they claimed they would be subjected to thereby. Their claim was refused by the lower court and on appeal this court affirmed the judgment for the reason that plaintiffs' property was " * * * not invaded or touched * * *" and that the damages claimed were purely consequential in their nature, " * * * necessarily conjectural, and impossible of any accurate determination, except after the construction of the road." [Page 150.] After the acceptance of the bridge, these consolidated suits were filed.

We wish first to dispose of plaintiffs' appeal from the judgment dismissing their suits against the City of Shreveport on the exceptions of no cause and no right of action. The basis of the action against the City of Shreveport, relied on by plaintiffs, is that the City, by ordinance, authorized the state to construct the bridge and approaches thereto in the manner and way in which it was done. It is their contention that under Section 11 of the charter of the City of Shreveport (Act 158 of 1898, as amended by Act 220 of 1912) its council had full power to make and pass ordinances such as are necessary

and proper "To regulate and make improvements to the streets * * * to prevent any encroachments upon or stopping and obstructing the streets * * * or any part of the landing or port of Shreveport * * *," and that the City was not divested of this control of the streets nor relieved of its duty to the public under the provisions of its charter by Section 22 of Article 6 of the Constitution of 1921, for the reason that at the time of the adoption of the ordinance the City of Shreveport had equal authority with the Louisiana Highway Commission to build a bridge over Red River (Article 6, Section 19, of the Constitution of 1921), and that this equal jurisdiction and authority to build the bridge has never been expressly repealed, nor was its control over its streets divested.

█ The City's authority to construct the bridge over Red River is derived from the broad and general provisions of Section 19 of Article 6 of the Constitution of 1921, while the Commission's authority comes under the mandatory provision of Section 22 of Article 6 of the same constitution, that the "* * * Highway Commission shall construct bridges over the Red River at or near * * * Shreveport * * *" out of the bond issue also provided for in the same section. Moreover, "* * * the rights and powers of a municipality are subject to the will and control of the legislature and it lies within the power of the legislature to take the control of some municipal department out of the hands of the municipality and turn it over to some board of state

officers. When this has been done, upon rudimental principles of justice, the municipality cannot be held liable for the negligence [or any other acts] of such officers, regardless of the nature of the function which they are administering." 19 Ruling Case Law, paragraph 394, under the title of Municipal Corporation. (Brackets ours.)

█ It is our opinion that the City's ordinance was not necessary for the construction of the bridge by the Commission and by its act in adopting the ordinance, the City only acquiesced in the acts of the Commission and its said act could not have had any effect on any injury plaintiffs may have suffered. The judgment of the trial judge, dismissing plaintiffs' suits against the City of Shreveport on the exceptions of no cause and no right of action, must, therefore, be affirmed.

Counsel for the Louisiana Highway Commission, in oral argument and in brief, conceded that plaintiffs' claims for damages on account of the construction of the bridge and the approaches thereto, if any, come under the provisions of Article 1, Section 2, of the Constitution of 1921, that "* * * private property shall not be taken *or damaged* except for public purposes and after just and adequate compensation is paid," but contend that the plaintiffs have failed to establish their respective claims for damages as required by law. (Italics ours.)

██ Under the provision of the Constitution above referred to, private property may not be damaged for public purposes without adequate compensation

being paid therefor. McMahon & Perrin v. St. Louis, Arkansas & Texas R. Co., 41 La.Ann. 827, 6 So. 640; Griffin v. Shreveport & Arkansas R. Co., 41 La.Ann. 808, 6 So. 624; Helmer v. Colorado Southern, N. O. & P. R. Co., 122 La. 141, 47 So. 443; Cahn v. City of Shreveport, 140 La. 158, 72 So. 909; Foster v. City of New Orleans, 155 La. 889, 99 So. 686; Chicago v. Taylor, 125 U.S. 161, 8 S.Ct. 820, 31 L.Ed. 638. See also Corpus Juris, vol. 20, pp. 672, 673, 674 and 13 Ruling Case Law, paragraph 90, at page 102. In such cases the measure of compensation is the diminution in the market value of the property. McMahon & Perrin v. St. Louis, Arkansas & Texas R. Co., supra; Helmer v. Colorado Southern, N. O. & P. R. Co., supra; Chicago v. Taylor, supra, etc.

Section 2 of Article 1 of the Constitution of 1921 is a substantial reproduction of Article 167 of the Constitutions of 1913 and 1898 and of Article 156 of the Constitution of 1879. Prior to the adoption of the latter Constitution, the organic law of Louisiana simply provided that private property could not be taken for public purposes without adequate compensation. Under such provision, there could exist no liability without a "taking of property," and the measure of compensation due was the value of the property taken—there could be no recovery for mere consequential damage without a physical taking of the property itself, nor could there be any recovery for damages resulting to individual owners in the way of discomfort, inconvenience, loss of business and the like. All such injuries

were regarded merely as the result of the exercise of a legal right and were held to be damna absque injuria.

These provisions of the several constitutions above referred to have been before this court on several occasions for consideration, the leading case being McMahon & Perrin v. St. Louis, Arkansas & Texas R. R. Co., 41 La.Ann. 827, 6 So. 640. In that case it was stated that [page 641] *"The article * * * of the * * * Constitution* [Section 156 of 1879—now Article 1, Section 2, of the Constitution of 1921] in providing that 'private property shall not be taken nor damaged for public purposes without adequate compensation,' etc., *only extended its protecting shield over one additional injury and required compensation, not only for property taken, but also for property damaged."* (Brackets and italics ours.) And the court, after announcing the rule for the measure of damages in such cases to be the diminution in the value of the property, commented as follows:

"There is no warrant for extending the liability one whit beyond this. *We are simply to inquire what damage has been done to the property, i. e., to its value for rental and sale.* Mere consequential injuries to the owners arising from discomfort, disturbance, injury to business, and the like, remain, as they were before, damna absque injuria, particular sacrifices which society has the right to inflict for the public good." (Italics ours.)

In the later case of Helmer v. Colorado Southern, N. O. & P. Railroad Co., 122 La. 141, 47 So. 443, this court held that

"* * * *noise, smoke, vibrations, etc., incident to the operation of defendant's trains in front of plaintiff's property are elements of damage to be considered, if the market value of plaintiff's property is thereby diminished, the amount of damages to be determined by the difference between the market value before the road was built and the market value afterwards." (Italics ours.) And in the case of Texas Pacific-Missouri Pac. Terminal R. Co. v. Elliott, 166 La. 347, 117 So. 275, the market value of the property "* * * is said to mean a fair value of the property between one who wants to purchase and one who wants to sell, under usual and ordinary circumstances." [page 276.] (Italics ours.)

In these several suits no injury is claimed to be due for physical invasion of property nor as a result of any improper location of the bridge or defect in the plan of construction. The damages claimed are wholly consequential.

The historical, as well as the physical, facts of the case have been succinctly stated by the trial judge and, in order that the issues involved may be properly and intelligently disposed of, are given here as follows:

"Texas is the principal business street of the city. It is a broad thoroughfare of seven blocks extending from Commerce Street next to the river on the east to the Methodist Church on the west. The cross streets beginning with Commerce in their order from the river west are Spring, Market, Edwards, Marshall, McNeil, Louisiana and Common. * * * The first two blocks from Commerce to Spring and Spring up to Market are shown to be made up of old type buildings, the first modern construction being the Commercial National Bank building and the rebuilt Youree Hotel on diagonal corners of Market. The modern retail district begins here, the two blocks toward the river deteriorating as it is approached.

"The construction complained of in this case is the approach to the bridge, which is erected in the middle of Texas Street and rises gradually from its beginning at about the east property line on Spring Street until it reaches a height of about twenty feet at Commerce.

"Texas Street was originally 100 feet wide between property lines, with 12-foot sidewalks. Because of the construction of the approach the sidewalks adjacent to the property involved herein have been reduced to eight feet from Spring Street to a point seventy feet from Commerce, where pedestrian steps up to the bridge level have reduced them further to five feet six inches. The street itself at the original grade has been reduced to two one-way 'No parking' lanes. The approach is solid from the ground up from Spring Street almost to the alley, half way to Commerce. From that point on it is open underneath between the piers, permitting passage and parking. Damage is claimed for interference with light and air.

* * * * * *

"The two lanes at their immediate beginning have an opening sixteen feet, eight inches wide. From there on almost to the alley nineteen feet. From there

on to where they are narrowed by the pedestrian steps, twenty-one feet. The steps narrow them to sixteen feet, and an open drainage construction at the intersection of Commerce restricts them further to thirteen feet, ten inches. The approach proper has a width of forty feet. There is some slight contest as to these measurements, but they are admitted to be approximately correct."

Plaintiffs, in support of their claims, rely mainly on the testimony of real estate men of the City of Shreveport, which was also the basis of the decision of the trial judge. Each made independent estimates of the value of the several properties involved here as of the time the construction of the bridge was begun and as of the time of the completion thereof; giving the difference between the two appraisements of each property as their opinion and estimate of the damage sustained. These several experts, in making their appraisals, stated that some of the elements considered by them in arriving at these estimates were the character and general use of the property, its assessed valuation, the cutting off of light and air, reduction of the sidewalk space, partial obstruction of their right of egress and ingress, and the diminution of revenues from the properties. But when considering their testimony carefully, we find that each of them, with the exception of Mr. Stoer, who testified only as to the Schnitt property, based their estimates almost exclusively on the decline of income produced by the properties, in accordance with schedules of the revenues from these properties furnished them for the years 1930 to 1934 inclusive.

The trial judge, in his written reasons for judgment, stated that "Undoubtedly some of the diminution in revenues was due to the depression," nevertheless, without making any allowance therefor, gave judgment based on what he considered to be the preponderance of the evidence as made up from the estimates of experts, none of whom seem to have taken this element into consideration in forming their opinions. His judgment was obviously based on an erroneous assumption that the " * * * testimony shows that other property has at the present time *practically* recovered from this set-back, but that the property involved has not." (Italics ours.) The testimony, on that point, preponderates to the contrary, that is, the recovery of these properties has been proportionate to that of other areas throughout the city.

A diminution of rent, under normal conditions, might be considered to be a reasonable test of the damage to the property, but it must first be shown with reasonable certainty that the decline was the direct and proximate result of the public improvement or construction complained of.

We must bear in mind that the years 1930, 1931, 1932, 1933, and 1934 followed the end of an era which will go down in history as the greatest period of expansion and inflation, and the beginning of a general economic depression which brought the value of commodities, properties, and rentals down to a comparatively subnormal level. This depressed condition existed until about the latter part of 1933 or the beginning of 1934,

from which time business generally improved, until about the time these suits were tried, when it attained a semblance of normalcy and stability.

In an effort to establish the fact that the diminution of the rental value of these properties was due to the construction of the bridge, testimony was extracted from plaintiffs' several expert witnesses to that effect, some expressing their opinion that they *thought* the cause was due to the construction of the bridge, while others simply stated they could not otherwise account for it. But in our opinion the record is replete with facts that refute the opinionative testimony of the experts and fortify our view that the construction of the bridge was not the sole factor that caused the diminution in the revenue of plaintiffs' properties, if it was a contributing factor at all.

For instance, plaintiffs' properties were under long term leases which expired at about the time of the letting of the contract for the construction of the bridge, some of which remained under the same tenancy even up to the time this suit was tried, these tenants enjoying a more lucrative and doing a larger volume of business than ever before. Another instance—plaintiffs' witnesses conceded that a return of 10% per annum on a real estate investment is considered to be a fair and reasonable return, yet several of the properties appraised by them are shown to have been yielding revenues at the time this suit was tried in excess of 10% and ranging as high as 30% of their appraisement as of the time following the construction of the bridge. The sole exceptions are the properties owned by Mrs. Barron et al., which have remained partially vacant since 1932, when the lease in favor of the Wesco Company expired (the present owners expressly negativing the idea that the bridge was the cause of the loss of this tenant and offering no explanation as to why it remained partially vacant) and the property of Mrs. Lucille Michel, which was only partially occupied. The Noel Estate property presents the anomaly of a tenant suffering a 75% reduction in rent despite the fact that he is doing 80% of the business he enjoyed during the boom years of 1928 and 1929. These conditions, we think, unless satisfactorily explained, are convincing that the high per cent of yield prior to the construction of the bridge was due to the era of expansion and inflation to which we have hitherto referred.

Moreover, the testimony conclusively shows that the business activities on Texas Street, long before the construction of the bridge, had gradually receded from the river banks and centralized westward on the same street and that as a consequence that section lost its importance as a business center, and, as stated by the trial judge in his written reasons for judgment, "Just how much of the diminution of value proven in this case is due to this cause, common to all river cities, it is difficult to say."

We are therefore of the opinion that the plaintiffs have failed to show, with the legal certainty the law requires, that the diminution in the rentals of their property following the construction of the

bridge was due solely and exclusively to this improvement. It appearing, however, that the bridge and the approaches thereto, as constructed, may have caused some damage to plaintiffs properties, or at least to some of the properties, we have concluded it will be to the interest of justice to nonsuit all of plaintiffs' claims against the Louisiana Highway Commission.

For the reasons assigned, the judgment of the lower court dismissing plaintiffs' suit as to the City of Shreveport on the exceptions of no cause and no right of action is affirmed, and its judgment against the Louisiana Highway Commission awarding damages to the several plaintiffs is annulled and set aside, and it is now ordered, adjudged, and decreed that plaintiffs' suits against the Louisiana Highway Commission are dismissed as of nonsuit. All costs to be paid by plaintiffs.